MOORE, Judge.
B.V. and D.V. (sometimes hereinafter referred to collectively as “the foster parents”) appeal from a summary judgment entered by the Montgomery Circuit Court in favor of Wanda Davidson, Karen Marks, and Clay Brannon on their tort-of-outrage claim. We affirm.

Procedural History

On April 30, 2008, B.V. and D.V., and their daughter, R.V., by and through her next friend, B.V., filed a complaint seeking compensatory and punitive damages against Wanda Davidson, Karen Marks, and Clay Brannon (sometimes hereinafter referred to collectively as “the defendants”) in them individual capacities. At all times relevant to the complaint, the defendants were all employees of the Macon County Department of Human Resources (“the Macon County DHR”). The foster parents alleged that the defendants had committed the “tort of outrage” by the manner in which they removed J.C., a foster child, from B.V. and D.V.’s home. Specifically, B.V. and D.V. alleged that they had acted as foster parents solely for J.C., a severely mentally retarded and autistic child, since November 1990, and that, through the years, they had developed a parent-child relationship with J.C. They further alleged that, on February 22, 2008, the defendants, “without notice or cause” and acting “willfully, maliciously, in bad faith, and in violation of state statutes and standards,” removed J.C. from the high school he was attending and from the home of the foster parents, informed the foster parents that J.C. would not be returning to their home, and thereafter refused any contact between J.C. and the foster parents and R.V.
On September 29, 2008, following the denial of their motions to dismiss, Davidson, Marks, and Brannon answered the complaint, generally denying all the factual allegations and asserting various affirmative defenses, including lack of standing and state-agent immunity. On May 5, 2009, Davidson, Marks, and Brannon filed a motion for a summary judgment, along with a brief and evidentiary materials in support thereof. In that motion, Davidson, Marks, and Brannon argued that the foster parents lacked standing; that the defendants were entitled to state-agent immunity; and that the defendants had not committed any acts of outrageous conduct. On May 11, 2009, the foster parents filed a *1189 response to the summary-judgment motion. On May 18, 2009, the trial court granted the defendants’ motion for a summary judgment without explanation. On June 16, 2009, the foster parents filed a motion to alter, amend, or vacate the trial court’s judgment; the trial court denied that motion on June 18, 2009. The foster parents appealed on July 30, 2009. This court conducted oral argument on April 21, 2010.

Facts

When viewed in a light most favorable to the foster parents, the record reveals the following relevant facts. J.C. was born with multiple medical problems, including later-diagnosed mental retardation, on August 19, 1989. Within months of J.C.’s birth, the Macon County DHR acquired legal custody of J.C. pursuant to dependency proceedings filed in the Macon Juvenile Court. On August 15, 1990, B.V. and D.V. became licensed foster parents, and the Macon County DHR placed J.C. in their home on November 21, 1990. J.C. remained in the home of B.V. and D.V. for the next 18 years, except for a 20-month period in 1999-2000 when he resided at the Mobile branch of The Learning Tree, a residential-care facility. Throughout that 18-year period, and at all times material herein, the Macon County DHR retained legal custody of J.C.
In 2005, when J.C. was 15 years old, the Macon County DHR developed an individualized service plan (“ISP”) in which it established long-term goals for the eventual permanent placement of J.C. either into the care of his natural relatives or into an adult custodial-care facility when he became eligible at age 18 years. Those long-term goals, of which both B.V. and D.V. had actual knowledge, remained the same for the next 8 years, as documented in the next 11 ISPs. However, as of January 2008, the Macon County DHR had not identified any particular placement for J.C. and none of the short-term goals that had been designed to prepare J.C. for the transition from foster care had been achieved.
On January 19, 2008, the foster-care license held by B.V. and D.V. expired. Nevertheless, J.C. remained in their care.[1] On January 23, 2008, the Macon County DHR conducted an ISP meeting that was attended by B.V. At that meeting, Marks, who had recently been appointed foster-care supervisor for the Macon County DHR, informed B.V. that the Macon County DHR was actively looking for an adult-custodial facility in which to place J.C. At that point, the foster parents had also been independently investigating adult-custodial facilities for J.C.’s potential placement; however, no specific facility had been identified and no definitive plan had been activated to remove J.C. from the home of the foster parents.
On February 22, 2008, the foster parents attended an ISP meeting held in a conference room at the high school J.C. was attending. The foster parents were not informed of the purpose of the meeting, which, somewhat unusually, had been set only a month after the last ISP meeting. Upon their arrival, the foster parents observed J.C. crying as he was being loaded into a vehicle that was to take him to weekend visitation with his maternal grandmother. The foster parents did not approach J.C. because it was common for *1190 J.C. to be upset when he was leaving for visitation and because the foster parents did not want to exacerbate the situation.
Once inside the conference room, the foster parents signed in and the meeting soon commenced. Brannon, who had recently been reassigned as the caseworker for J.C., having previously served in that capacity from August through December 2007, presided over the meeting. After calling the meeting to order, Brannon announced the “good news” that an opening had arisen at a different branch of The Learning Tree that served as an adult-custodial facility and that J.C. would be placed there on the following Monday. The foster parents were shocked by the news. B.V. almost immediately fled from the room crying and telephoned the foster parents’ attorney. D.V. remained in the room and questioned Brannon as to why the foster parents had not been involved in the decision to transfer J.C. Brannon responded that the foster parents had not been consulted based on their past disagreements with the Macon County DHR regarding the “case planning” for J.C. D.V. also inquired whether the foster parents would be allowed to visit J.C., but Brannon had said that that subject would be addressed later.
Brannon adjourned the meeting 10 or 15 minutes after it commenced. After the meeting, in a hallway, D.V. again questioned Brannon regarding the foster parents’ being allowed to visit J.C. Marks intervened and told D.V. that the hallway was an inappropriate place to discuss the matter and that she would contact D.V. on the following Monday regarding visitation. D.V. testified that Marks never called him. Brannon testified that The Learning Tree has a policy disallowing visitation for 30 to 45 days after admission. D.V. testified that all subsequent attempts to arrange visitation with J.C. through the Macon County DHR failed.
Unbeknownst to the foster parents, the decision to remove J.C. from their home had been made three weeks earlier. Sharon Ficquette, counsel for the Alabama Department of Human Resources (“the Alabama DHR”), had convened a meeting in her office in Montgomery at which Marks, Davidson, and other personnel and consultants of the Macon County DHR and the Alabama DHR determined that it would serve J.C.’s best interests to be transferred to The Learning Tree in Tallassee, which had only recently experienced an unexpected opening. According to Davidson, at that same meeting, “counsel” had also instructed that, in order to minimize any disruption with the transfer, the foster parents were not to be told of the decision until the February 2008 ISP meeting. Marks testified that the decision not to inform the foster parents had actually occurred in subsequent meetings with “counsel.” Brannon testified that he understood from a meeting with supervisors of the Macon County DHR, including Marks and Davidson, that he was not to tell the foster parents of the decision until the February 2008 ISP meeting. Davidson, Marks, and Brannon all attested that, by not immediately informing the foster parents of the decision, they were merely carrying out the instructions of the Alabama DHR’s counsel. They also all testified that they had anticipated and understood that the foster parents would be emotionally disturbed by the news, although none of them had specifically intended to inflict emotional distress on the foster parents.
B.V. and D.V. admitted that they had known that the Macon County DHR had legal custody of J.C. and that it could legally remove J.C. from their home. B.V. testified, however, that she had not thought the purpose of the February ISP *1191 meeting would be to discuss a transitional placement for J.C. She testified that the ISP team had been waiting for certain evaluations to be scheduled. D.V. testified that the move was inconsistent with the complete program the ISP team had agreed on for J.C. and that the team had just started planning for J.C.’s transition. B.V. testified that, had she received notice that J.C. was going to be placed at The Learning Tree, she would have prepared J.C. and her family and would have sought the advice of professionals. She testified that she would have gathered information to learn more about what J.C.’s placement at The Learning Tree would entail so that she could have participated in making a transition plan. D.V. also testified that he would have tried to prepare himself, J.C., and his family if he had known that J.C. was about to be removed from their home.
B.V. testified that the manner in which J.C. was removed from the foster parents’ home had been devastating. She described, among other things, “initial shock, grief, hurt, sadness, despair, hopelessness, sleeplessness, fatigue, irritability, reflux, esophageal spasms, weight gain, weight loss, nightmares, [and] anxiety.” She testified that she worries about how J.C. is and is concerned for D.V. and R.V. B.V. testified that her husband had suffered “sleeplessness, irritability, difficulty concentrating, loss of focus[,] ... weight gain, weight loss[,] ... [and] dizziness.” Both B.V. and D.V. testified that they had been prescribed medication as a result of the manner in which J.C. was removed from their home. B.V. also testified that, due to the manner of the removal of J.C., R.V. had been diagnosed with depression, for which she had been prescribed medication and was receiving weekly psychological treatment.

Standard of Review

“The standard of review applicable to a summary judgment is the same as the standard for granting the motion.” McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
“A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmov-ing party must present ‘substantial evidence’ creating a genuine issue of material fact — ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Ala. Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).”
Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).

Discussion

On appeal, the foster parents argue that the trial court erred in entering the summary judgment in favor of Davidson, Marks, and Brannon because, they say, they offered substantial evidence in support of their tort-of-outrage claim.
“A plaintiff seeking to establish the tort of outrage bears a heavy burden. ‘The tort of outrage was not developed *1192 to provide a person with a remedy for the trivial emotional distresses that are common to each person in his everyday life.’ U.S.A. Oil, Inc. v. Smith, 415 So.2d 1098, 1101 (Ala.Civ.App.1982). As our supreme court has explained:
“ ‘This Court first recognized the tort of outrage, or intentional infliction of emotional distress, in American Road Service Co. v. Inman, 394 So.2d 361 (Ala.198[0]). In Inman, the Court held that to present a jury question the plaintiff must present sufficient evidence that the defendant’s conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it....’”
Hurst v. Cook, 981 So.2d 1143, 1156-57 (Ala.Civ.App.2007).
The foster parents specify that they do not challenge the authority of the Macon County DHR, as J.C.’s legal custodian, to transfer him from their care to The Learning Tree, but, instead, they assert that the manner in which the change in placement was conducted amounted to outrageous conduct. The foster parents point out that the decision to remove J.C. from their home abruptly without allowing them and R.Y. an opportunity to say goodbye or to have any contact with J.C. so as to ensure his smooth transition into his new living arrangement was so outrageous that it should not be tolerated in a civil society. Gunter v. Huddle, 724 So.2d 544, 547 (Ala.Civ.App.1998) (“ ‘With respect to the conduct element, this Court has stated that the conduct must be “so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.” ’ ” (quoting Harris v. McDavid, 553 So.2d 567, 570 (Ala.1989))); see also American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980). The foster parents maintain that J.C.’s removal was conducted in such a manner that all who were involved knew or should have known that it would cause emotional upset of such a nature that no one reasonably could have been expected to have endured it.
Alabama law allows for the summary removal of even natural children from their family home in order to protect their welfare. See Ala.Code 1975, § 12-15-306. When a foster child is involved, Alabama caselaw suggests that state actors may act summarily to remove a child in even less urgent circumstances when the child is not at risk. The supreme court in Mitchell v. Davis, 598 So.2d 801 (Ala.1992), a case conditionally extending the doctrine of parental immunity to foster parents, stated that “[fjoster children can be transferred at any time.... ” 598 So.2d at 805 (emphasis added). In English v. Macon, 46 Ala.App. 81, 238 So.2d 733 (Civ.App.1970), this court held that a foster father, from whom the State Department of Pensions and Security had, without notice, removed a foster child after nine years, had no legal recourse to gain information regarding the welfare of the child or to seek visitation. See also Clements v. Barber, 49 Ala.App. 266, 270 So.2d 815 (Civ.App.1972) (foster parents lacked standing to recover custody of child removed by the State Department of Pensions and Security). The reasoning employed in those cases suggests that, so long as a state agency retains legal custody of a child, employees of that agency may lawfully remove the child without notifying a foster parent.
That caselaw, however, predates the adoption of the Foster Parents’ Bill of Rights. See Act No. 2004-257, Ala. Acts 2004, p. 351, § 1, codified at Ala.Code 1975, §§ 38-12A-1 and 38-12A-2. In per *1193 tinent part, the Foster Parents’ Bill of Rights provides:
“The Department of Human Resources shall ensure that each foster parent shall have all of the following rights:
“(1) The right to be treated with dignity, respect, trust, value, and consideration as a primary provider of foster care and a member of the professional team caring for foster children.
[[Image here]]
“(12) The right to information of scheduled meetings and appointments concerning the foster child and permission for the foster parent to actively participate in and provide input to be used by the ISP team in the case planning and decision-making process regarding the child in foster care, including, but not limited to, individual service planning meetings, foster care reviews, individual educational planning meetings, and medical appointments.
[[Image here]]
“(17) The right to necessary information on an ongoing basis which is relevant to the care of the child, including timely information on changes in the case plan or termination of the placement and reasons for the changes or termination of placement to the foster parent, except in the instances of immediate response of child protective service.”
Ala.Code 1975, § 38-12A-2. In addition, the Alabama DHR has promulgated regulations that, among other things, (1) include foster parents as part of all ISP teams, see Ala. Admin. Code (DHR), Rule 660-5-47-.04(3)(a), (2) include foster parents in ISP meetings at which removal decisions are to be made, see Ala. Admin. Code (DHR), Rule 660-5-47-.05(5)(b), and (3) prohibit the exclusion of foster parents from ISP meetings “because of their view about strengths, needs, or services, or their displeasure or dissatisfaction with DHR or a provider’s activities,” see Ala. Admin. Code (DHR), Rule 660-5-47-.04(4)(b). Both the Foster Parents’ Bill of Rights and the operative regulations provide that, except in cases in which a child must immediately be removed from a foster-care placement for the protection of the child, foster parents shall be given an opportunity to be part of the ISP team making the decision to remove the child and shall be provided timely notice before the removal of the child from the foster home. Those provisions do not alter the rule that a state agency with legal custody of a child may always remove the child from a foster home when it determines removal to be in the child’s best interest; however, it alters the manner in which that decision is to be made and how the removal is to be carried out.
Applying current Alabama law and the Alabama DHR regulations to the facts of the ease, when viewed in a light most favorable to the foster parents, it appears that violations of both the Foster Parents’ Bill of Rights and the Alabama DHR regulations attended the removal of J.C. from the home of the foster parents. The foster parents had been part of J.C.’s ISP team for years and had long acknowledged that the Alabama DHR had established transferring J.C. to an adult-custodial facility as one permanency goal. However, the foster parents were excluded from the meeting held in Montgomery at the beginning of February 2008 at which it was determined that the permanency goal would be achieved by removing J.C. from the foster parents’ home and transferring J.C. to The Learning Tree. At the time of that meeting, the foster-care license held by the foster parents had expired; however, they continued to act and to be treated as foster parents for J.C. in accordance with the *1194 Macon County DHR policy, see note 1, and, as such, had a general regulatory right to attend the meeting. It appears that the foster parents were not given an opportunity to present any input into the decision to remove J.C. from their home or to place him in The Learning Tree because of the foster parents’ past disagreements with the Macon County DHR over the proper case plan for J.C., which is no lawful basis for having excluded them. Lastly, the foster parents deliberately were not informed of the decision to remove J.C. from their home until he had already been taken away under the guise of merely visiting his maternal grandmother, which is hardly “timely” under any definition the legislature could have intended when enacting § 38-12A-2(17).
Were this court faced with the question whether the Alabama DHR and the Macon County DHR acted lawfully in the manner in which it removed J.C. from the home of the foster parents, the answer would be a simple and resounding, “No.” However, the immediate question before us is whether the foster parents and R.V. have presented substantial evidence indicating that the individual defendants, Davidson, Marks, and Brannon, committed acts of outrageous conduct. On that point, we must agree with the learned trial judge that the foster parents have failed to carry their very high and exacting burden of proof.
The undisputed evidence in the record indicates that the decision to delay informing the foster parents of the plan to remove J.C. until after he had already been taken away, the act that the foster parents allege to be outrageous in nature, was made unilaterally by counsel for the Alabama DHR and that Davidson, Marks, and Brannon had simply followed the instruction of counsel by waiting to inform the foster parents of the transition plan until the February 22, 2008, ISP meeting. The individual defendants did not object to the plan, but any alleged failure to question the advice of counsel can hardly be construed as a deliberate or reckless action on their part intended to cause emotional distress to the foster parents and R.V.
With that said, we note that the Foster Parents’ Bill of Rights places a duty on DHR to treat foster parents with respect and dignity. That duty may be carried out only by the individual members of DHR, whether at the state or county level. When making a decision regarding the best interests of a child, personnel of the Alabama DHR and the various county DHRs must not ignore the ramifications of those decisions on the foster parents upon whom both they, and the entire state, rely to care for dependent children. Even a cursory review of the facts of this case reveals that the foster parents were not treated with the respect and dignity they deserved.
The record shows without dispute that the foster parents acted as the primary caregivers for J.C. from the time he was a young child until after his 18th birthday. During that time, the foster parents incorporated J.C. into every facet of their family existence. Because of J.C.’s special needs, the foster parents devoted extra attention to his safety, welfare, and education, often advocating for him to assure that he received quality care even while outside their home. In his deposition, Brannon testified that, during his time serving as the caseworker on this case, he observed that the foster parents had forged a relationship with J.C., which he described as that of loving parents to a young child. It should have been obvious to any person concerned that the summary removal of J.C. from the foster parents’ home would be felt by the foster parents as strongly as would the summary removal *1195 of their own natural children, which Bran-non, Marks, and Davidson all at least implicitly acknowledged would cause any rational person extreme emotional distress.
Regardless of the law, which, as set out above, militated . against the decision to conceal the plan to remove J.C. from the foster parents, human compassion should have compelled all involved to have developed a transition plan that would have accounted for the natural anxiety the foster parents would surely endure upon the departure of J.C. For a state agency whose main function involves supervising and coordinating intimate human relations, the decision to rip from the foster parents a child to whom they had undoubtedly devoted their love and attention for many years, without even allowing for a proper goodbye, appears especially and unnecessarily callous. But see DiBattista v. State, 808 A.2d 1081 (R.I.2002) (affirming summary judgment in favor of the Department of Children, Youth, and Families on foster parents’ outrage claim, in part, because the department’s actions in revoking the foster parents’ license and removing their foster children were not extreme and outrageous).
In conclusion, although we strongly disapprove of the decisions leading up to the removal of J.C. from the home of the foster parents, we affirm the summary judgment on the ground that the foster parents did not present substantial evidence indicating that the individual defendants committed acts of outrageous conduct. We, therefore, pretermit any discussion of the other issues raised by the parties in their excellent briefs.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs specially.
THOMAS, J., concurs in the result, without writing.

. Marks stated in her affidavit that, ”[o]n occasion, children in the custody of DHR may remain for a short time in a formerly-licensed foster home after the expiration of the license to allow time for DHR to make an alternative placement or to permit additional time for the former foster parents to obtain a new license. This delay, however, does not alter or change the fact that the home is no longer licensed. After a licensed foster home loses its license, if a child is still in that home, it is merely a temporary interim placement.”