MOORE, Chief Justice
(dissenting).
I respectfully dissent from the Court’s decision to deny J.C.’s petition for the writ of certiorari. Three years ago, the Court of Civil Appeals, in considering another issue, noted that if the issue was whether “the Alabama [Department of Human Resources] and the Macon County [Department of Human Resources] acted lawfully in the manner in which [they] removed J.C. from the home of the foster parents, the answer would be a simple and resounding, ‘No.’ ” B.V. v. Davidson, 77 So.3d 1187, 1194 (Ala.Civ.App.2010) (a companion lawsuit brought by J.C.’s foster parents). It is undisputed here that the orders of the Macon County Department of Human Resources (“DHR”) regarding J.C.’s placement, services, foster-family contact, and foster-family visitation violated the Department of Human Resources’ own regulations and that, in issuing those orders, DHR exceeded its authority.
In this case, J.C. presents this Court with a material question of first impression: Whether a foster child can hold DHR employees personally liable in tort for making decisions that deviate from Department'of Human Resources’ regulations and policy. Because DHR’s actions toward J.C. furnish “special and important reasons for the issuance of the writ,” under Rule 39, Ala. R.App. P., I believe this Court should grant the writ and consider J.C.’s question of first impression.

I. The Facts

The facts, as J.C. presents them in his petition, are as follows. J.C. is an autistic, severely mentally retarded young man. His foster parents, B.V. and D.V., raised him from infancy until shortly before his 18th birthday. The defendants in the case are Karen Marks, a social worker and foster-parent supervisor for DHR; Teresa Momon, supervisor of DHR; Wanda Davidson, director of DHR; and Sharon Ficquette, general counsel for the Department of Human Resources.
In March 2007, Ficquette stated that “[J.C.] has been in that home for seventeen years and [B.V. and D.V. are] who[m] the child knows as his parents .... [T]he fact of the matter is that 24 hours a day [J.C.] is in this home and these are, in effect, his parents.” In mid-2007, Ficquette recommended to the Ma *709 con Juvenile Court that B.V. and D.V. receive legal custody of J.C. Nonetheless, on February 6, 2008, DHR workers decided to remove J.C. from his foster parents’ home and place him in a residential institution, The Learning Tree. J.C.’s individualized service plan (“ISP”) team did not recommend that he receive residential treatment before he was removed from his foster parents’ home. J.C. did not have an assessment, as required by Department of Human Resources’ policy, that recommended placement in a residential-care facility. DHR workers did not consult with J.C.’s medical or psychiatric providers before deciding to place him at The Learning Tree. J.C.’s guardian ad litem did not participate in the decision to remove J.C. from his foster parents’ home and to place him at The Learning Tree. The defendants did not inform J.C. ahead of time of their decision to remove him from his foster family, nor did they allow J.C. the opportunity to say good-bye to his foster parents or his siblings.[1]
After J.C.’s removal, and despite repeated pleas by B.V. and D.V., the defendants did not allow B.V. and D.V. to see J.C. or to have any contact with J.C. for over 17 months. While J.C. was at The Learning Tree, he spontaneously responded to greetings with the words “Momma Daddy.” At The Learning Tree, J.C. was physically restrained and suffered severe emotional distress.
J.C. sued the defendants solely in their individual capacities. J.C. alleged that the defendants were negligent and wanton in deciding to change his placement with B.V. and D.V. and in how that change was effectuated. J.C. alleged that the defendants’ conduct of not allowing him to say good-bye to his foster family or to have visits or contact with them was outrageous. J.C. alleged that the defendants were negligent and wanton in failing to afford him an opportunity to visit with and to maintain contact with his foster parents.
The trial court entered a summary judgment for the defendants. J.C. appealed, and the Court of Civil Appeals affirmed the decision of the trial court, without an opinion. J.C. v. Davidson (No. 2111026, January 11, 2013), — So.3d—(Ala.Civ.App.2013) (table).

II. Applicable Department of Human Resources’ Regulations

J.C. alleged that his placement at The Learning Tree violated several administrative regulations that govern DHR’s selection of appropriate foster-care resources.
“When substitute care becomes necessary, children should be placed in the least restrictive setting possible. This means the most family-like setting that can provide the environment and services needed to serve the child’s best interests and special needs. In substitute care, relative placement should always be given first consideration after which Foster Family Care, Group Home Care, and Institutional Care are to be considered in that order. If the Department [of Human Resources] places children in foster family homes/unrelated homes, group homes and child care institutions, these placement resources are required to be in approved/licensed status except as otherwise ordered by a court of law.”
Reg. 660-5-28-.05, Ala. Admin. Code (Dep’t of Human Res.). A foster child’s case plan must include a “justification of the appropriateness of the placement as whether it is ... in the least restrictive (or family-like) setting available, relative placement to be given first consideration, after which foster family care, group home care, and institutional care are to be considered, in that order.” Reg. 660-5-28-.06(b)(1), Ala. Admin. Code.[2]
*710 J.C. also alleged that DHR’s placement decision violated his right as a foster child to visit with friends, which includes adults and children and others with whom the foster child has a significant bond.
“The child in foster care has the right to visit with parents, other family members, and friends unless visiting places the child’s safety at risk; substantially inhibits attainment of the goals of the safety plan or the permanency goal of the ISP; or subjects the child to intimidation regarding investigative statements or court testimony. An ISP need not be in place for visits to occur. Visits will begin immediately upon placement unless restrictions are imposed. Visits with parents or others may not be used as rewards or punishment. Visits are to take place in the most normalized, family-like setting that meets the child’s need for safety.”
Reg. 660-5-50-06(1), Ala. Admin. Code. The regulation continues:
“Visiting is needed to maintain and strengthen family and other attachments. Visiting is also a right of the child and family. Thus the ISP will identify visiting as a step needed to maintain and/or strengthen attachments to parents, other family members, and friends; and the ISP will identify steps needed to permit visiting that is desired by the child and family.”
Reg. 660-5-50-.06(l)(a)(emphasis added). Regulation 660-5-50-.03(7), Ala. Admin. Code, defines “friend” as “[a] person other than a family member with whom the child has a significant attachment. Friends include both adults and children, such as former foster parents and children from previous foster care placements.”
J.C. also alleged that the defendants’ decision to remove him from his foster parents’ house violated regulations of the Department of Human Resources regarding his ISP. The Administrative Code provides:
“ISPs shall be developed, reviewed, and revised in partnership with the age-appropriate children, their parents, service providers, and other members of the child and family planning team; and be based on underlying conditions related to identified safety threats and risks.”
Reg. 660-5-47-05(1), Ala. Admin. Code. The regulation states that “ISPs will be reviewed and needed revisions made ... when changes in family members’ circumstances warrant review and possible revision; [and] prior to the decision to remove a child from home.” Reg. 660-5-47-.05(5)(b), Ala. Admin. Code. The Department of Human Resources’ regulations define “emergency situation” as “[a] situation where the child is at imminent risk of serious harm and action to protect the child must be taken before a child and family planning team can be convened to develop an ISP.” Reg. 660-5-47-.02(10), Ala. Admin. Code. Foster-care parents are part of the foster child’s family-planning team:
“The individuals involved in planning and/or delivery of services for a child and family. The team shall include the age-appropriate child, the parent(s), others requested by the child or family, the [Department of Human Resources] worker(s), the foster care provider and other service providers if any. Their work product is known as the individualized service plan (ISP).”
Reg. 660-5^47-02(4), Ala. Admin. Code.

III. Alabama Precedent

A review of Alabama’s reported cases indicates that the question J.C. presents is *711 indeed one of first impression for Alabama’s appellate courts. Neither this Court nor the Court of Civil Appeals has had occasion to address the tort claims brought by a foster child against Department of Human Resources workers for making placement decisions that deviate from Department of Human Resources’ regulations and policy. Under prior Alabama law, Department of Human Resources workers would have been entitled to limited parental immunity for a negligence action filed by a foster child. In Mitchell v. Davis, 598 So.2d 801 (Ala.1992), this Court held that both foster parents and Department of Human Resources workers may assert the parental-immunity doctrine as a defense to simple negligence claims brought by foster children. The Mitchell Court explained:
“Foster parents differ from natural parents and others who stand in loco par-entis, because there is no relationship by blood, marriage, or adoption. Foster parents are selected and approved by [the Department of Human Resources]. Foster care is temporary and is based upon a contract with the state. Foster children can be transferred at any time, and the foster home must be monitored by [the Department of Human Resources], Foster parents are paid a supplement for necessities of the foster children. Therefore, this Court considers it necessary to limit the parental immunity doctrine to claims of simple negligence as it relates to foster parents.
“The parental immunity doctrine should also be available, in a qualified form, to the commissioner, the [Barbour County Department of Human Resources], the [Barbour County Department of Human Resources] director, and the case supervisor charged with the care and custody of foster children. That is, they also should be able to assert the parental immunity doctrine as a defense to claims of simple negligence by foster children. Alabama has already concluded that [the Department of Human Resources] stands in loco paren-tis to children of unfit parents.”
Id. at 805.
In 2010, the Court of Civil Appeals reasoned that Mitchell and prior cases suggested that, “so long as a state agency retains legal custody of a child, employees of that agency may lawfully remove the child without notifying a foster parent.” B.V. v. Davidson, 77 So.3d at 1192. However, the Court of Civil Appeals noted that our decision in Mitchell predated Alabama’s Foster Parents’ Bill of Rights, found in § 38-12A-2, Ala.Code 1975, and also the promulgation of the Department of Human Resources’ administrative regulations.
“Those provisions do not alter the rule that a state agency with legal custody of a child may always remove the child from a foster home when it determines removal to be in the child’s best interest; however, it alters the manner in which that decision is to be made and how the removal is to be carried out.”
77 So.3d at 1193 (emphasis added).
Thus, Mitchell’s parental-immunity doctrine as applied to Department of Human Resources workers would not bar J.C.’s tort claims because the promulgation of the Department of Human Resources’ foster-care administrative regulations have altered the manner in which decisions to remove a child from a foster home may be made and carried out.
In Gowens v. Tys. S., 948 So.2d 513 (Ala.2006), this Court held that a Department of Human Resources worker was not entitled to State-agent immunity from a child’s negligence claim where the worker did not comply with a fundamental mandate in the Department of Human Resources Family and Children’s Services Manual. Id. at 527. Likewise, on J.C.’s *712 negligence claims, there is at least a fact question as to whether the defendants would be entitled to State-agent immunity-under Ex parte Cranman, 792 So.2d 392 (Ala.2000), when they did not comply with the Department of Human Resources’ administrative regulations and policies regarding J.C.’s placement at The Learning Tree.

TV. Judicial Condemnation of DHR’s Actions

As noted above, in B.V. the Court of Civil Appeals stated that if the issue before it was “whether the Alabama [Department of Human Resources] and the Macon County [Department of Human Resources] acted lawfully in the manner in which [they] removed J.C. from the home of the foster parents, the answer would be a simple and resounding, ‘No.’ ” B.V., 77 So.3d at 1194. The court further held in B.V.:
“Applying current Alabama law and the Alabama [Department of Human Resources’] regulations to the facts of the case, when viewed in a light most favorable to the foster parents, it appears that violations of both the Foster Parents’ Bill of Rights and the Alabama [Department of Human Resources’] regulations attended the removal of J.C. from the home of the foster parents.”
77 So.3d at 1193. The court further opined:
“It should have been obvious to any person concerned that the summary removal of J.C. from the foster parents’ home would be felt by the foster parents as strongly as would the summary removal of their own natural children, which Brannon,[3] Marks, and Davidson all at least implicitly acknowledged would cause any rational person extreme emotional distress.”
77 So.3d at 1194-95. It further stated:
“For a state agency whose main function involves supervising and coordinating intimate human relations, the decision to rip from the foster parents a child to whom they had undoubtedly devoted their love and attention for many years, without even allowing for a proper goodbye, appears especially and unnecessarily callous.”
77 So.3d at 1195. Then Judge Bryan concurred specially in B.V., and wrote:
“I recognize that the Alabama [Department of Human Resources] is charged with an extremely difficult task - protecting children throughout the State with finite resources, both financial and human. However, that is no excuse for how the foster parents were treated in this case. It is hard to believe how anyone could have imagined that the disruption caused by J.C.’s transfer would be minimized by informing the foster parents in the manner chosen. The only positive aspect of this case is that, hopefully, [the Department of Human Resources] will never proceed in like manner again.”
77 So.3d at 1195 (Bryan, J., concurring specially).
In 2011, this Court granted B.V.’s petition for the writ of certiorari to review the record for evidence indicating that the defendants acted intentionally or recklessly. However, the Court thereafter quashed the writ because it found there was no evidence indicating that the defendants had acted intentionally or recklessly as to the foster parents. See Ex parte B.V., 77 So.3d 1195 (Ala.2011). Justice Murdock *713 concurred specially and wrote, in which writing Justice Wise concurred:
“I was shocked and saddened by the apparently callous and cruel manner (whether or not done on advice of counsel) in which the 18-year-old mentally retarded child in this case was so suddenly taken from the only parents he had ever known, parents who had raised him for almost his entire life.”
77 So.3d 1196 (Murdock, J., concurring specially).
I agree with the sentiments of now Justice Bryan and Justice Murdock. The unlawful removal of a foster child from his foster parents’ home where he lived for the previous 17 years is wanton, extreme, and outrageous. No reasonable person could be expected to endure what J.C. has endured.

V. Conclusion

I believe that J.C. has sufficiently pleaded a material question of first impression that gives this Court the opportunity to address J.C.’s tort claims against the defendants for making foster-care-placement decisions in violation of Department of Human Resources’ regulations and policy. Moreover, I believe that the defendants’ egregious violations of the Department of Human Resources’ regulations and policies as to J.C.’s placement at The Learning Tree furnish special and important reasons for the issuance of the writ of certiorari for this case. I therefore dissent.
WISE, J., concurs.

. The facts are unclear whether the siblings are J.C.'s foster siblings.

. Alabama adopted Regs. 660-5-28-.05 and .06, Ala. Admin. Code, pursuant to the federal *710 Adoption Assistance and Child Welfare Act of 1980 ("AACWA”), 42 U.S.C. § 670 et seq. The AACWA made sums of money available to the states to provide foster care for children, which would be made available once a state adopted an AACWA-compliant plan.

. Clay Brannon was an appellee in B.V.; he is not a party to the action underlying this appeal.